UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA PROWANT,

       Plaintiff,                                             Hon. Ellen S. Carmody

v.                                                                        Case No. 1:09-CV-242

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## CORRECTED OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. On May 28, 2009, the parties consented to proceed in this Court for all further proceedings, including an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Gordon J. Quist referred the matter to this Court. (Dkt. #7).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner denied Plaintiff's applications for benefits. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 51 years of age at the time of the ALJ's decision. (Tr. 23). She successfully completed high school and worked previously as a final finisher. (Tr. 74-75, 110).

Plaintiff applied for benefits on December 5, 2005, alleging that she had been disabled since February 4, 2003, due to neck and shoulder pain. (Tr. 68-72, 104). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 25-67). On June 12, 2008, Plaintiff appeared before ALJ Robert Erickson, with testimony being offered by Plaintiff and vocational expert, Linda Berkley. (Tr. 398-440). In a written decision dated July 25, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 18-24). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

X-rays of Plaintiff's thoracic spine, taken on September 25, 1998, revealed degenerative disc disease with no evidence of bone, joint, or soft tissue abnormality. (Tr. 166). X-rays of Plaintiff's cervical spine, taken the same day, revealed fusion of C4-C5 and "degenerative

3

osteoarthritis with minimal degenerative disc disease." (Tr. 165). There was no evidence of neural foraminal narrowing or disc space abnormality. (Tr. 165).

On March 16, 1999, Plaintiff participated in a CT scan of her head, the results of which were negative. (Tr. 164). X-rays of Plaintiff's cervical spine, taken the same day, revealed a "congenital block vertebra formation at the C4-5 level." (Tr. 163). The discs "above and below this level are well maintained" with no evidence of fractures or soft tissue abnormalities. (Tr. 163).

On January 24, 2000, Plaintiff participated in an MRI examination of her left scapula, the results of which were "negative." (Tr. 161). On March 9, 2000, Plaintiff participated in an MRI examination of her left shoulder, the results of which revealed "a small amount of fluid" within the bursa and a "mild" abnormality of the acromion process. (Tr. 158). There was, however, no evidence of a rotator cuff tear, tendon atrophy, fracture, or AC joint abnormality. (Tr. 158). Plaintiff was subsequently diagnosed with adhesive capsulitis and chronic rotator cuff tendonitis of the left shoulder for which she underwent arthroscopic surgery on August 17, 2000. (Tr. 156, 305-08).

On November 13, 2000, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed "congenital fusion of C4 with C5," with no evidence of stenosis, herniation, or cord abnormality. (Tr. 154). An MRI of Plaintiff's thoracic spine, performed the same day, revealed a "small herniation" at T-10, which the doctor reported "is not significant." (Tr. 153). The examination was otherwise "normal." (Tr. 153).

On January 13, 2003, Plaintiff reported that her employer has "her standing in an upright position doing repetitive work," which was causing her "severe pain." (Tr. 214). Plaintiff reported that she had previously been performing "a more work friendly regimen," consistent with the "limitations placed [on her] by the work comp doctor." (Tr. 214).

On January 29, 2003, Plaintiff reported that she was continuing to experience difficulty at work. (Tr. 210). Specifically, Plaintiff reported that "[t]hey had her doinig job training situations that she could do and now they've decided for some reason that, even though that job is still available, she needed to do some other things that cause her problems." (Tr. 210). Plaintiff later reported that, "they put me on grinding to teach me a lesson." (Tr. 209).

On March 10, 2003, Plaintiff was examined by Dr. James Ellis. (Tr. 147-48). Plaintiff reported that she was experiencing neck and scapular pain, as well as headaches. (Tr. 147). Plaintiff exhibited "tremendous snapping of the scapula," but "excellent shoulder range with no pain with impingement maneuvers." (Tr. 148). Spurling's maneuver[1] caused "mild" neck pain, but no radicular pain. (Tr. 148). Lhermitte's sign[2] was negative. (Tr. 148). Plaintiff exhibited full range of elbow and wrist motion and Tinel's sign[3] was negative. (Tr. 148). Plaintiff was diagnosed with left snapping scapula syndrome and myofascial pain. (Tr. 148). The doctor reported that Plaintiff could perform work activities subject to the following restrictions: (1) no grinding, (2) no forceful pushing or pulling, (3) no lifting more than 10 pounds, and (4) no repetitive looking down. (Tr. 148).

---

[1] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited January 13, 2010).

[2] Lhermitte's sign consists of twinges resembling a mild electrical shock felt in various parts of the body. It is observed in cases of multiple sclerosis and irritation and thickening of the membranes covering the brain and spinal cord, as well as other demyelinating diseases (i.e., diseases in which the myelin covering of nerves is lost). J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* L-100 (Matthew Bender) (1996).

[3] Tinel's test (or Tinel's sign) refers to a tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury. This test is also used to detect the presence of carpal tunnel syndrome. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-140 (Matthew Bender) (1996); Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

On March 18, 2003, Plaintiff reported that she was "doing fairly well." (Tr. 205). Plaintiff noted, however, that she was not working because her employer "would not let her return with [the] restrictions that she had." (Tr. 205).

On March 27, 2003, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed "congenital fusion of the C4 and C5 vertebrae." (Tr. 152). The "cervical vertebrae otherwise maintain their height and demonstrate normal signal characteristics." (Tr. 152). There was also no evidence of cord compression or abnormality. (Tr. 152). Plaintiff also participated in a bone scan of her head, neck, upper thorax, and shoulders, the results of which were "normal." (Tr. 24).

On April 22, 2003, Plaintiff was examined by Dr. Randal Palmitier. (Tr. 143-44). Plaintiff exhibited full range of cervical motion and Spurling's maneuver was negative. (Tr. 143). An examination of Plaintiff's left shoulder revealed full range of motion, negative impingement testing, and normal rotator cuff strength. (Tr. 143). An examination of Plaintiff's upper extremities revealed normal strength with no evidence of sensory deficit. (Tr. 143-44). Dr. Palmitier concluded that Plaintiff was suffering from "possible" cervical discogenic pain and "probable" myofascial pain disorder. (Tr. 144). The doctor observed that "an epidural injection may be beneficial." (Tr. 144).

On May 19, 2003, Plaintiff received a cervical nerve root block injection. (Tr. 151). Plaintiff reported that she obtained "good relief" from this treatment. (Tr. 206). Plaintiff received another such injection on June 11, 2003. (Tr. 149). On July 16, 2003, Plaintiff reported that she was experiencing "less pain." (Tr. 206). The doctor reported that "other than the fact that she's not able to do heavy lifting and repetitive and pressure type work where she is leaning a lot," Plaintiff was doing "better." (Tr. 206).

On December 8, 2003, Plaintiff was examined by Dr. Ellis. (Tr. 140). Plaintiff reported that she was "doing a little bit better." (Tr. 140). The doctor renewed Plaintiff's work limitations, noting that such may need "to be long-term restrictions." (Tr. 140). On January 23, 2004, Plaintiff reported that "as long as she's not working, she seems to do fairly well." (Tr. 197).

On March 4, 2004, Plaintiff participated in an exercise stress test, the results of which were "negative. . .without chest pain or diagnostic EKG changes." (Tr. 242-43).

On June 16, 2004, Plaintiff reported that she was "doing fairly well" and that her medication "is working quite nicely." (Tr. 193).

On January 14, 2005, Plaintiff was examined by Dr. Ellis. (Tr. 138-39). Plaintiff reported that she was "doing well" and had "been able to wean down" on her medications. (Tr. 138). Plaintiff reported that she had recently obtained a receptionist job through her rehabilitation providers, but that talking on the telephone without a headset "really bothered her." (Tr. 138). Plaintiff reported that she was experiencing left-sided headaches. (Tr. 138). The results of a physical examination revealed that Plaintiff "has no trigger points, a negative Spurling's and she appears quite comfortable." (Tr. 138). The doctor reported that Plaintiff was able to perform work activities subject to the following limitations: (1) no use of the telephone without a headset, (2) she requires a sit-stand option, (3) no repetitive looking up or down, (4) she can sit for no more than 60 minutes at one time, (5) she cannot lift more than 10 pounds with no pushing or pulling. (Tr. 139).

On February 25, 2005, Plaintiff was examined by Dr. Ellis. (Tr. 178-79). Plaintiff reported that she experiences neck and shoulder pain, but that it "tends to go away" when she takes her medication. (Tr. 178). An examination revealed no evidence of trigger points and Spurling's and Lhermitte's testing were both negative. (Tr. 178). Plaintiff did exhibit "snapping of the scapula

7

but otherwise good range of motion of the shoulder." (Tr. 178). The doctor recommended that Plaintiff participate in therapy. (Tr. 179).

On March 4, 2005, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed "partial congenital fusion of C4 and C5." (Tr. 155). There was, however, no evidence of fracture, malignancy, foraminal encroachment, cord compression or cord abnormality. (Tr. 155).

On June 6, 2005, Plaintiff was examined by Dr. Emmanuel Obianwu. (Tr. 294-304). An examination of Plaintiff's left shoulder revealed full range of motion with no evidence of instability, impingement, or "functional compromise." (Tr. 301). Plaintiff exhibited full range of motion in her cervical spine without muscle tightness. (Tr. 301). An examination of Plaintiff's upper extremities revealed no evidence of muscle weakness, atrophy, or sensory changes. (Tr. 301-02). The doctor concluded that Plaintiff suffered from "mild" cervical spondylosis, which was not disabling in severity. (Tr. 302).

Treatment notes from March 9, 2005, through October 10, 2005, indicate that Plaintiff was experiencing increased neck and shoulder pain. (Tr. 172-77). Treatment notes dated November 28, 2005, indicate that Plaintiff "has restrictions to pretty much all activities to the left shoulder." (Tr. 170).

On December 4, 2007, Dr. Dannie Tabor completed a report concerning Plaintiff's physical limitations. (Tr. 290-93). The doctor reported that without interruption Plaintiff can sit for 1-2 hours, stand for one hour, and walk for 30 minutes. (Tr. 290). The doctor reported that during an 8-hour workday, Plaintiff can sit for 2 hours, stand for one hour, walk for one hour, and sit/stand for 2 hours. (Tr. 290). Dr. Tabor reported that Plaintiff can occasionally lift/carry 10 pounds. (Tr.

8

290). The doctor reported that Plaintiff can perform grasping and manipulation activities frequently with her left hand and occasionally with her right hand. (Tr. 291). The doctor reported that Plaintiff can occasionally push/pull 10 pounds with her right hand. (Tr. 291). The doctor reported that Plaintiff can occasionally bend, twist, squat, stoop, and climb stairs, but can never kneel, crouch, crawl, or reach above shoulder level. (Tr. 291).

At the administrative hearing, Plaintiff testified that she can sit for 30-45 minutes and stand for 30 minutes before she begins experiencing neck, back, and shoulder pain. (Tr. 414-15). Plaintiff reported that she can walk "about two blocks" before she has to "sit and rest." (Tr. 416). She reported that she uses a TENS unit that "takes the edge off [her] pain." (Tr. 415-16). Plaintiff reported that her medications cause her to experience "constant" drowsiness. (Tr. 418). She testified that she experiences pain "all the time" that rates between 5-8 (on a scale of 1-10). (Tr. 430). Plaintiff reported that she never leaves her house except to assist her mother or attend a doctor appointment. (Tr. 431).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from degenerative disc disease, migraines, and left shoulder degenerative joint disease, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 20-21). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 21-24). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

9

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v.*

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[5] subject to the following limitations: (1) she can only occasionally climb ramps or stairs; (2) she cannot climb ropes, ladders, or scaffolds; (3) she can occasionally balance, stoop, kneel, crouch, and crawl; and (4) she cannot perform activities that expose her to vibrations, hazardous work environments, or noise. (Tr. 21).

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Linda Berkley.

---

[5] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

The vocational expert testified that there existed approximately 3,900 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 433-35). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988).

### 1. The ALJ Failed to Properly Evaluate the Opinion of Plaintiff's Treating Physician

As indicated above, Plaintiff began treating with Dr. Ellis no later than March 2003 and was treated by Dr. Ellis on a regular basis for at least a two year period. During this time, Dr. Ellis consistently imposed upon Plaintiff functional limitations greater then those recognized by the ALJ in his RFC determination. Specifically, Dr. Ellis opined that Plaintiff is unable to lift more than 10 pounds and requires a sit-stand option. Plaintiff asserts that the ALJ failed to appropriately evaluate Dr. Ellis' opinions.

Defendant does not dispute that Dr. Ellis qualifies as a "treating physician" as that term is defined by the relevant Social Security regulations. The opinion expressed by Dr. Ellis is certainly inconsistent with the ALJ's conclusion that Plaintiff retains the ability to perform a limited range of light work. However, while the ALJ obviously rejected Dr. Ellis' opinion, he failed to articulate *any* rationale for doing so.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the

medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

However, as the Sixth Circuit has clearly held, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any

13

> subsequent reviewers the weight the adjudicator gave to the treating
> source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

As previously noted, the ALJ failed to articulate any rationale for his decision to accord less than controlling weight to Dr. Ellis' opinion. In light of the fact that the doctor's opinion is inconsistent with the ALJ's RFC determination, the ALJ's failure is not insignificant. The ALJ's failure in this regard clearly violates the principle articulated in *Wilson* and requires that the Commissioner's decision be reversed.

The Court further notes that while the *Wilson* court "d[id] not decide the question of whether a *de minimis* violation may qualify as harmless error," it recognized three circumstances that would perhaps constitute such a *de minimis* violation: (1) where the treating source's opinion is "so patently deficient that the Commissioner could not possibly credit it;" (2) where the Commissioner "adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) where the Commissioner "has met the goal of § 1527(d)(2). . .even though she has not complied with the terms of the regulation." *Id.* at 547. As none of these circumstances are presently applicable,

the Court finds that the ALJ's failure to provide good reasons for discounting Dr. Ellis' opinion does not constitute a *de minimis* violation.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist compelling evidence that Plaintiff is disabled. The Commissioner's decision must, therefore, be reversed and this matter remanded for further factual findings, including but not necessarily limited to, the proper consideration of the opinions expressed by Dr. Ellis.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. The Court further concludes, however, that there does not exist compelling evidence that Plaintiff is disabled. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.

Date: January 22, 2010   /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge